Page number 13, guest 2200, People v. James Pledge All right, would counsels who are going to present eyewitnesses please step up to the podium, please? Morning. Morning, Your Honor. I want to state your names, please, for the record. Jeff Spada from the State Appellate Defender for James Pledge. Assistant State's Attorney Justin Kors on behalf of the people. All right, so 15 minutes apiece, time for rebuttal. Yes? Yes. Three or four minutes. Three or four minutes? Okay. All right. Thank you. Your Honor, if I may, before I begin, there was a motion to cite additional authority. Has the court had the chance to consider a rule on it? Yes, and the court will consider the additional authority. Thank you, Your Honor. And may it please the court, I represent James Pledge. If there is two issues here in the briefs, I'd like to argue both this morning, beginning with the first, which is about the Circuit Court's total violation of Rule 431, which is the rule that is supposed to protect my client's right to a fair jury trial. The jury selection. The second issue? I'm sorry? And the second issue? Sir, the second issue has to do with the court's abuse of discretion in sanctioning a defense for failing to list a witness in its answer to discovery. All right. Well, before you proceed, I have a question. On the issue of the reasonable doubt, how do you reconcile this case with People v. Johnson? It appears that it's the same trial court and the same mannerisms and the same method of setting out the four principles. Your Honor, Johnson is instructive on one question, which is that these remarks are unacceptable. In Johnson, the court noted that it does not condone this sort of behavior out of the Circuit Court, specifically Judge Gahan. However, the scope of the error presented in this case is unprecedented. In Johnson, the court was just presented with the court's definition of reasonable doubt. Here, we have a total breakdown in the jury selection process, both 431A and B. The 431B error was compounded by the court suggesting reasonable doubt. Moreover, Johnson predates Downs, which is one of the cases I cited in additional authority, which makes crystal clear that the court cannot define reasonable doubt. Significant here that the court used an analogy that suggests a percentage to define the standard began by saying, some of you may have been served on a civil jury, used an analogy of scale and said, if you just tip it, that's the preponderance standard. It used that analogy again and extended it to suggest a definition of reasonable doubt. In terms of the actual mannerisms, the reference is not clear exactly what the judge was doing. Johnson is again helpful on that point, Your Honor, because this court did not hesitate to review the remarks. The language in Johnson is, the court evidently gestured, and that's precisely what happened here and what was appropriate. Downs makes clear that it's not so much what the definition of reasonable doubt was, but the very fact that the court decided to explain it. If I may, for a second, I'd like to read what Judge Gaughan said here. Illinois does not define reasonable doubt. This suggests that Judge Gaughan knew the law that was settled and clarified in Downs, but egregiously went on and said, but if you use the analogy in a criminal case, the burden of proof is reasonable doubt. If you use the analogy of scale, it would be like this. That record is clear enough, as it was in Johnson, for this court to consider this issue, and it makes plain that Judge Gaughan suggested a definition to the veneer. We know that is unacceptable now under Downs. And again, it compounded the so-called Zerr error here under the 431. Well, if you're approaching this under 431, then that raises the question of whether or not this is forfeited. Why isn't this forfeited? It is forfeited. And? It's reviewable under the substantialized problem of the plain error rule. Why would you say that? Because, as made clear in Thompson and Zerr, Rule 431 protects a Sixth Amendment right to a jury trial. Since Wilmington, we know that a limited just Section B violation cannot be reached under the substantialized problem of the rule. However, as I said before, this is an unprecedented series of errors. I think I'd like to read again for just a quick second, if I may, the very first question of the very first sentence of the rule. The court shall conduct a warranted examination of prospective jurors by putting to them questions it thinks appropriate, touching upon their qualifications to serve as jurors. The court's got to do it. It has to do it with questions it comes up with and considers to be appropriate, and it must do it to ensure that the jurors are qualified to guarantee my client's right to a fair trial. This case has 85 pages of transcripts, hours, where the court gave its courtroom over to the prosecutor, cloaking her with the court's authority, advocating its role as a neutral lawgiver, and allowing this prosecutor to establish a rapport with the veneer. Are you saying that the judge has to say, what's your name? Where do you live? How many kids do you have? What is your job? He can't let the prosecutor do that or the defense lawyer. Absolutely, yes. That's what the rule requires. Do you have a case that says that or has interpreted the rule to say that the court has to ask those questions? The best we have is Garcecki. That's why this is an interesting issue is because the court has never violated the rule in this complete way before. Garcecki. I mean, I haven't looked hard enough, but I was a trial court judge at 26 in California for 18 years. I always did all of my questions. There were judges there who never did any of their questions. They always let the state and the defense do the questions, and I have not seen a case that says that that's wrong. There is none. Maybe I didn't get assigned to represent those clients on appeal, Your Honor. The rule in Garcecki and also in Thompson, the Supreme Court had the opportunity to evaluate this shall language. In Garcecki, the issue had to do with the second sentence of the rule. But the court made clear that the shall creates a mandatory directive on the court to do voir dire. At its most basic, voir dire is about the court selecting a qualified set of jurors so that my client gets a fair trial. That's not what happened here, and for that reason, reversal is required. I think Your Honor mentioned practically at 26th Street. The reason this rule creates the non-delegating authority just to the court to do voir dire is because think about a prosecutor doing voir dire, which is what happened here. It creates the same thing. It changes the interaction. That's what I don't understand. I know that there are four questions that the judge needs to ask and get a, do you understand them, do you accept them? But the other question is, if a state's attorney asks for the defense or asks what's your name and where you work, why is it wrong if the answers are not incorrect that both sides are getting? That's what I'm not understanding. For two reasons. One, the rule requires it, doesn't allow it. In no case in the Zara Thompson context is the error presented as the state's attorney or the defense counsel was the one that went through the Zara principles. Those have to come from the court. That is not. I'm not talking about the four. Right. Presumptive, in a sense, et cetera. I'm talking about the other part of the questioning. Why can't the state and or the defense lawyer do all of the questioning except for those four questions? Because the rule doesn't allow for it. Simple as that. It's helpful here. And that's why I'm saying you don't have a case that says that. This issue has never been presented before. So the language, though, at the outset of Section B, which Your Honor mentioned, and at the section of A is identical. The court shall, the court shall, the court shall conduct lawyer examination, that's Section A. The court shall ask each potential juror. Zara Thompson is never, ever about the state's attorney doing Zara or a defense counsel. If it were, that would be inappropriate under the rule. It just doesn't happen. But the rule doesn't go into the extent or the length or whether or not in terms of conducting, how to conduct? It does not. It just gives the court none delegating, for lack of a better word. It creates an obligation on the court that it can't delegate to do all those things. It allows the court discretion. It thinks appropriate. It does not allow the court to pass that off on the state. And I'd like to return to the practical point I suggested earlier, or I'm going to suggest now, which is if you allow a side, a counsel, to do voir dire, it changes how voir dire is conducted. When it's a state's attorney asking you, let's talk about your criminal background. Let's talk about your interaction with the Chicago Police Department. How did my office, how did Anita Alvarez's office handle that for you? We want frank responses from the veneer. We don't want prospective jurors to be less than forthcoming because a prosecutor is asking them questions. And counsel in this case, the prosecutor is an officer of the court, sure. But both sides, her and my client's trial lawyer, have an interest in creating a favorable panel, not a fair one. Can I ask a question? Did the judge in any way limit the defense lawyer from asking the same questions? No, but as a practical matter, I don't think that would have ever been allowed. Why? It would have had the exact opposite effect that part of the error here is allowing the prosecutor to establish a rapport with the veneer. For hours she went on, had defense counsel assumed that the court would have ever allowed him to go through exact same questions. Did the court stop the defense lawyer from asking questions? No, the court didn't do anything. He sat on his hands. I mean, then after the prosecutor, did he say to the defense lawyer, Counsel, would you like to ask the benign questions? And then the lawyer started asking questions. Counsel asked a question about whether I didn't say how many he asked. I said, what did the judge say to the defense lawyer? When was his turn? Nothing. Nothing? The defense lawyer just started talking? Yes. After the prosecutor finished. Yes. I'm fairly confident, if I remember the record correctly, that counsel asked one question. I think the best way to answer a question, your honor, is that the opposite effect would have happened had defense counsel gone through all of voir dire again. The prosecutor just stood up there and did the vetting for hours. What questions were overreaching during the examination of the potential jurors by the prosecutor? Where did they cross the line? What specific questions were asked that would cause us to look at it as you suggest? The error here is not with the questions themselves, but the fact that the court did not present them to the veneer. The right question is how do you draw that line based on the way that 431 is written? 431B sets out some very specific questions that the court must ask. But subsection A envisions a process where the court may turn over the process to the lawyers. And it says that the court may allow the lawyers to ask additional questions. And, you know, depending on the circumstances, where do you draw the line as to how many questions are too many? I think you're right, your honor. And that's the process. And then Garcecki, right, Garcecki came up because defense counsel argued he should have been allowed to supplement the court's questioning. Garcecki isn't affirmed because the process imagined in the Supreme Court's opinion, the correct process, which did not happen here, is the court, the language is, with questions it thinks appropriate in its discretion after it does the meat and potatoes of voir dire. So this is discretionary? It may, under Garcecki. Right. But that's a discretion issue. It's not, it's de facto. Okay. So my question is, how do we evaluate the court's discretion in asking the zero questions and then allowing the attorneys to ask the remainder of the questions based on subsection A? Where would we cut off the line? The court has no discretion, has no authority from the Supreme Court to delegate voir dire to the state. Well, how many questions are appropriate? From the court? That's an academic question. That's a physical academic rule. I'm asking you. I mean, we're going to, you're asking us to write an opinion that sets forth a rule that hasn't been set in the case before. Yes. And I'm asking you, where's the line? The rule is that 431 does not allow for a party to do all of voir dire. It just let 431 be. It doesn't answer my question. How much? How much is the lawyer allowed to do? The lawyer, that's Garcecki. Any questions? I think we're talking about apples and oranges, right? Garcecki is about after the court does voir dire, and that's sort of like a Tootsie Pop question, like how many lips does it take? The court says it thinks appropriate. So if the court wants to go on for hours, for 85 pages of transcripts, that's fine. If the court decides that the rule says that I specifically have to ask four questions. So I'm going to ask those four questions because that's the only specific questions that are set out in the rule. And then I'm going to let the counsel ask the rest of the questions. You're saying that the rule says you can't do that? The rule absolutely says you cannot do that. Well, how many should you delegate? Zero. Zero questions. I'm sorry. I was confused about your question. Are you asking how many questions the court can delegate? The answer is zero. The answer is you can't even ask the veneer. What's your authority for this? The Supreme Court rule itself. The court shall. Well, what does it say? What does it say that a party may not ask questions? What does it say that the court may not allow the parties to further ask questions during a court hearing? Garcecki is. You referred to the rule. So where in the rule does it say that the court cannot then ask the parties to ask questions of the jurors? Reading the first two sentences. The first sentence, which I've already read. The second sentence begins, the court may permit the parties to submit additional questions. These two sentences read together describe the following. Is there one more sentence after that? Yes, there is one more. There's two more. What are those sentences? Those say questions shall not directly or indirectly concern matters of law or instructions. And the court shall acquaint prospective jurors with the general duties and responsibilities of jurors. In my opinion, that last sentence is questions, you know, like if you see an attorney on your way to the restroom and they can't respond to you, that sort of housekeeping sort of stuff. The first question. What do you do for a living? I'm sorry? What do you do for a living? No, that's voir dire. That's what I'm saying, though, but the questions that do not indirectly concern the law or instructions would be, for example, what do you do for a living? Where do you live? If the court thinks that's important to qualification, like your education level. Isn't it important to know what type of job someone has or how it might affect their qualifications to sit as a juror? I think so, but the point of this case, the point of this record, is we have no idea what Judge Gahan thinks because he just turned his court over to a prosecutor to do it. It came back to the same question Judge Reyes asked you earlier, I think it was. What question was asked inappropriately? The issue is not about... I know it, but if the judge didn't say, where do you work? And the state's attorney said, where do you work? And that's a relevant question, or what's your educational background? The judge didn't say it, but the prosecutor said it. What is wrong with that? That's what I'm not getting here. Because the rule doesn't say what you say, and there's no... It doesn't say it the way you say it, just because it says... I'm sorry, just because it says the court shall. It doesn't say the court shall ask, where did you go to school? Where do you live? How many children? It doesn't say that. The question is what the court thinks is appropriate. Ladies and gentlemen, the court doesn't think anything is appropriate except those four questions. Anything else anybody else wants to know, they can ask. I think the best answer to the question is that having a party duvoir beer changes entirely the dynamic of the questioning. We want frank jurors. It's the court's job to ensure a fair jury trial. We know that from Thompson and Zare. Why don't we move on to your next issue? Sure. That issue concerns the court's abuse of discretion in preventing a defense witness, Sienna Coy Coy, from testifying that my client had hand tattoos at the time of the incidents. Before we get to that, I'm just going to ask you one more thing. Maybe you've already answered it. Based on the Johnson case, well, first of all, do you think Johnson was correctly decided? Back in the academic? Yeah, I do. I think it's wrongly decided now in light of Downs. How do you get to that? If Downs were authority prior to Johnson being decided, I don't think that result would have been the same. Downs makes crystal clear that a court cannot define reasonable doubt to the court. In Downs, it's a jury question during deliberations, but the court can't sua sponte define reasonable doubt to the veneer. And this court didn't hesitate to make clear that it does not condone that behavior. But they didn't find it to be reversible error. So what's different about this case than Johnson? Two things. First is the court defined reasonable doubt as it was messing up the Zara principle about reasonable doubt. It's conflating the first and third Zara principle. In the instant case of Bauer-Rauner, I'm sorry, the court is confusing Zara, it's committing Zara error, and as it's doing so, compounding that error by giving a reasonable doubt instruction to the veneer. That's one. Two is, in Johnson, we didn't have a 431A violation. We didn't have a complete breakdown in the selection process where the court turns over its room to the prosecutor and suggests to the veneer that this counsel, a head of defense counsel, who's sitting there silently, is on a level with me, positioning her a head of defense counsel alongside itself. So are you saying that you don't win on B alone, you have to have A and B? I just have to have the entire rule, Your Honor. A and B, yes. The reason we don't have a case like this is because there's never been a record, on a published decision anyway, where a circuit judge at 26th Street commits this many errors during jury selection. So how does Downs help you here? Because didn't the court in Downs say that there was no plain error, and therefore they didn't consider the issue, right? Right. Again, like in Thompson, you know, Thompson dealt with just a discrete 431 violation. Downs involved no error because the court actually in Downs approved of the court's response. The jury sent out a note that said, please help us figure out reasonable doubt, something like that. 60, 70, 80 percent asked it in terms of percentages. The court responded correctly, consistently with well-established law, saying, I can't define reasonable doubt for you, do it yourself. The court found no error because there was no error. Here, Judge Gahn says, Illinois does not define reasonable doubt, but I'm going to go ahead and define it for you anyway. Egregiously violating the law, the law that was settled before Downs and clarified in that decision. That's how Downs helps me. I know we're staying on this forever, but it just came to me. The judge says this in his opening remarks. Then they get the jury instructions. Then in the jury instructions it gives you presumption of innocence, reasonable doubt. I mean, do you think that that would prevent this from being plain error? Because even though the judge said that, they got the written instructions at the end that are really the correct instructions. No, because they've already been told what reasonable doubt is. They don't have to ask the question in Downs because they already got the answer from the judge. No, it doesn't cure the error. And, you know, you mentioned prior. The IPI instructions are silent with regard to a definition of reasonable doubt. So the definition thrown out there is still sitting there uncontradicted. Exactly. Yeah. You know, it's important going back to 615 and hearing the Watershed decision on plain error talks about this court's authority to relax the forfeiture rule, to reach errors that affect the integrity of the judicial process. A complete breakdown in voir dire is a breakdown of the judicial process. Right? The court's basic job at a jury trial, especially at the beginning, is to assure that a fair jury gets there. That's for my client. That's also for the state. So is the evidence here closely balanced? There's a combined record here. And at least three of the four main witnesses. I should say I did not raise closely balanced prong as to the first issue. But I'm happy to argue, answer the question as to the second. And the answer is yes. Three of the four eyewitnesses here had serious credibility problems. One of them, on his way to the station to make a lineup ID, testifies that he's heard that they already have the guy and he's going to be at the station. Another woman says that she just picked the guy out of the lineup who, the only one that remotely resembled the offender. Right? And that's why this tattoo evidence mattered. It's because basically what happened here in four cases is a guy comes in without gloves on, walks these people around their houses. Having tattoos on your hands is an obvious unique feature that anyone. What is complexion? Because I can see tattoos on you, but there are family members I can't see them on. So that's why. Does the record say what is complexion is? The record doesn't speak to my client's complexion. It does. How big the tattoos are or anything. Does it offer proof about them? There's not a proffer about describing the tattoos themselves. There are parts of the record where, with the two witnesses I just mentioned, counsel has his client stand up and has him go over to the witness and have the witness acknowledge that there are tattoos there that they can see. At a distance. Without a gun. I said without a gun. Right. Right. I thought, I mean, I read this quickly, but I thought that there was somebody who said they couldn't even, they couldn't see the tattoos on his hands when the hands were shown to the witness. No, the record is the opposite. You know, for instance, he's up there and I think it's Serrato. He's positioned at a distance similar to the distance the offender was to the person during the incident. And they acknowledge, yes, I can see the hand tattoos now. But didn't four of the witnesses identify the defendant as the actor in this? In open court? Yes. Yes. But as a practical matter, once you make that line-up ID and you're sitting there in court, and the least credible person in the room, just by nature of his position, unfortunately, is my client, right, you've already made a line-up ID. The problem with these witnesses' credibility is that, you know, Kraus says, am I running out of time? Kraus says, I just picked out the guy that remotely resembled the offender. And she, once she makes a line-up ID, she comes to court, she's sworn in, he's sitting at the table. Well, you're not relying on this prong anyway. So you're relying on the fact that it's a second prong playing out. Just to be clear, in the second issue we're relying on closely balanced and substantial rights, but not in the first. The first issue is about the abuse of discretion and discovery sanction issue. As to the tattoos? Yes. Yes, Your Honor. As to the voir dire issue, we're relying on just the substantial rights prong. You know, the substantial right here is nothing less than my client's right to a fair jury trial. We know that in Thompson, right, in Zara, that's the right that this Rule 431 protects. And the court violated both prongs. Or, I'm sorry, both sections of the rule. If there are no further questions, I'm going to save the rest of my time for rebuttal. Thank you. Thank you. Good morning, Owners, and may it please the Court. Assistant State's Attorney, Justin Cordes, on behalf of the people. Morning. Over the course of six days, from June 26, 2010 to July 1, 2010, defendant committed four separate home invasions. And this was within a five to six block radius. And defendant would enter each residence armed with a firearm,  During his fourth home invasion, Mr. Williams, again, directed the victims around their home at gunpoint, looking for items to steal, shot one of the victims, ran away. While he was apprehended, he was found in possession of one of the victims' driver's license, insurance card, jewelry stolen from the residence, and then finally, defendant's fingerprints were also discovered on a television inside that residence. At a show-up, Mr. Williams, the owner of the home, identified the defendant as the individual who shot him and ran him around the home at gunpoint looking for items to steal. Furthermore, after the defendant was apprehended, the police officers conducted line-ups with all three individuals who were the victims of the previous home invasions. What about this issue about the tattoos? The issue about the tattoos, Your Honor? Yes. Well, in this situation, I want to clarify, because I think it's not very clear based on your discussion with defense counsel. Out of the four individuals who identified defendant in a line-up, when they were asked at trial whether or not defendant had these tattoos, they either said they did not see them or he did not have tattoos. Now, what the defense attorney did during this entire process was, he said, all right, he had his defendant come up, stand up, walk into the well in the courtroom, and asked if they saw the tattoos. Now, Mrs. Krause said, no, I do not see the tattoos on his hands currently. The defense attorney asked the court to allow the defendant to step closer. The defendant was three feet away from Mrs. Krause, and at that point in time, she said she could see the tattoos. Mr. Serrato said he could not see the tattoos at any point during this, when defense counsel brought the defendant into the center of the well in the courtroom. I thought that was my recollection. You are correct, Your Honor. Okay. And then Menders and Williams stated they said that they saw the tattoos. However, Mr. Williams said, to tell you the truth, I wasn't looking at his hands. I was looking at the gun. So in this situation, while defense counsel attempted to use this for impeachment purposes, these witnesses stated that they did not see them, and they were not, based on the record, it's not necessarily clear that they were visible at that period of time. Furthermore, the evidence in this case is overwhelming, that this is the individual who committed these armed robberies, or these home invasions. Just as I stated before, he was found in possession of proceeds from the Williams home. He immediately identified him after he was apprehended by the officers. And, Your Honor, it's extremely clear in this situation that this is the individual who committed these armed robberies. Furthermore, the people elected to proceed solely on the fourth home invasion, it was the defense counsel who motioned to trial all four of these cases together. Well, what about the issue about the gunshot residue turning out to be negative? Your Honor, a defendant was observed carrying two firearms by the police officers before he jumped the fence. He dropped these firearms. One of the firearms was found with a spent casing. Now, there was testimony during trial in which they discussed this lack of gunshot residue. The defendant was tussling with Mr. Williams, fired the gun, continued to tussle, and then ran away and jumped a fence. He was jumping fences, running, trying to get away from these officers. And it's possible, as was discussed, that it could have sweated up, it could have rubbed off as he was jumping fences, running through yards, doing these different things. And as a result, it's possible that this gunshot residue could have just come off as a result of the fact that he was going through some vigorous activity. I'd like you to spend some time talking about the reasonable doubt instruction and the trial judge's scale analogy. Yes, Your Honor. As this Court has stated in Johnson, which was a case specifically directed on one of the This is based on a previous case dealing with Judge Gunn. And this Court stated that although it did not condone the reference to the comparison to the civil standard, it could not say that the trial court's comments did constitute error in this case. Now, during this entire... In the Johnson case, the Court said that we don't condone this analogy. And then noted the fact that the trial judge in that case additionally stated that it's the highest burden in the land. That's not present in this case. You're correct, Your Honor. However, in this situation, as Judge Gunn was going through this process of dealing with the reasonable doubt instruction, we're not necessarily clear as to what happened in this situation with Judge Gunn's discussion of reasonable doubt. There was no objection made by defense counsel. There's no offer of proof as to what he did with his hands. We don't know exactly what occurred. There's a number of cases that have come out of the same trial court with regard to this scale problem. And some of them, the transcripts say, indicate that when the judge was talking, for instance, it's indicated. In this case, it apparently doesn't say that. But he says, like this. So I think it's pretty clear that what he's doing is he's got his arms up in the air in front of the veneer, and he's mimicking a scale. So my question is, since the Supreme Court has said over and over and over again, don't define reasonable doubt, how are we supposed to write an opinion that says it's okay to put your arms up in the air and show the jury where on a scale reasonable doubt lies? How many times are we supposed to say, by the way, we don't condone this, but it's okay? I understand, Your Honor. However, in this situation, there's no indication in this record that would indicate that these jurors understood this instruction to allow a conviction based on anything less than proof beyond a reasonable doubt. There's nothing that would state that. This court isn't necessarily clear on the degree to which Judge Gahan measured his hands. That's our problem. If he did this, and I will say there's no record, but I've got one hand on the table and one hand straight up in the air, then you know it's pretty high. But if he's doing this, you know, we just don't know what he did. And I'm going to say it, he shouldn't do it. We all know he shouldn't do it. I agree with Judge Palmer. It's just so hard to say when you've said to a judge, don't do it, and they continue to do it, that they're not violating the defendant's right to a fair trial because they're suggesting to the jury what reasonable doubt is, and they can't define it. And when you put your arms up in the air and you say this is reasonable doubt, you can say it's like the minutes on a clock, or you can say it's degrees in a circle, or you can say it's percentages, but when you read downs, it's clear that the Supreme Court doesn't want anything said about percentages to the jury. And so what's the percentage that Judge Gahan told the jury is beyond reasonable doubt? And, by the way, since this is like, there's a couple reported decisions with regard to this, there's a number of unreported decisions with regard to this, and there's even one that we had last year, I'm not sure if anybody's aware of it, we had another one of these where before we got to render a decision, the defendant passed away. I think there's at least seven or eight cases coming out of the same trial court with regard to this scale issue. So if the judge puts his arms up and he says in seven cases, it's not a machine, it's not mechanical, in seven different cases he puts his arms up and he says this is by preponderance of the evidence, I should say for the record I'm indicating, if this is beyond, this is by preponderance of the evidence, and this is beyond a reasonable doubt, and he does that in this case, and then in the next case he says this is beyond a reasonable doubt, that's not going to be the same level he told the last jury. So he may have told seven different juries seven different levels of beyond a reasonable doubt. How can we condone that? Your Honor, the people have stated that in this situation, these varying levels or whatever it is that Judge Gunn is doing is left up to the people's, the jurors' interpretations in this situation, and as a result the juror is in and of itself deciding what reasonable doubt to them is. I'm sorry, I can't, you know, the trial judge told them this is beyond a reasonable doubt and he held his arms up. So the jurors weren't left as they're supposed to be to the job of deciding what reasonable doubt is themselves. The judge said this is it, which according to Downs you're just not supposed to do. And so I guess I'll ask the question that another one of our panel members always asks. Tell me how to write it. How do we write after Downs? How do we write it's okay for the judge to do this? I would say similarly to the way that you wrote people, V. Johnson, that it's not condoned by the court. However, it's not considered to be something that would cause reversible error in this situation. What about the issue that prior to doing the reasonable doubt scale, the judge compares it to the civil standard? Does it have a positive comparison saying, you know, like in civil you have this, and then he uses the same example for the reasonable doubt in criminal? Doesn't that cause some type of confusion for the jurors in terms of the standards that you're supposed to consider? Well, Your Honor, it's in essence. There's no explanation in the record as to the difference, the distinction. It goes from civil rather than criminal in using the same analogy. Well, yes, Your Honor. I mean, he discusses the fact in order to differentiate that this is not a civil case, saying that, you know, it's more likely than not an event occurred. However, he separates that by saying that, you know, Illinois does not define reasonable doubt. And so the judge goes ahead with that. It's stating that, you know, like it's not defined in Illinois. And so in this situation. If you put your hands up in the air and you say this is it, does that define a reasonable doubt? Your Honor, it's not given an actual definition as to, you know, like this quantum of proof like down says, you know, like 60, 70, 80 percent is reasonable doubt. It's not, you know, an actual, you know. Isn't it quantifying? When you put your arms in the air and you say to the jury, this is civil, this is criminal, this is beyond reasonable doubt, isn't that at least quantifying what the burden is? And isn't quantifying what the burden is the same thing as defining it? Well, if you were to look at it, there's the civil standard and there's the criminal standard, okay? And when you stated earlier that the judge has stated in previous cases that it's the highest burden in the land, when he makes that comparison between the civil standard and the criminal standard, he's differentiating. And while this court does not condone it, he's differentiating that it is a higher standard than it is in a civil case. There we don't know because we didn't see it. Well, this is true, Your Honor. However, that's because defense counsel did not object to this and did not make a record as to what Judge Golden was doing. Well, how is this different than People v. Jenkins where the judge referred to the amount of water in a glass when he was trying to describe the reasonable doubt standard? I mean, in Jenkins, that's like an actual – there's a finite volume in which, you know, you can see – I would equate that with a percentage as was discussed. You know, it's an actual thing, whereas this, you know, this is not like a finite percentage of, you know, like 50%, 60%, 70%, 80%. And the water, isn't it the same thing, basically? I mean, Your Honor, it's – the people would state that they do not believe so because of the fact that it's just – it's just a differentiation between the civil and the criminal standard in this situation. Is it your position that this issue is forfeited? Yes, sir. Could you respond on that, please? Yes. At no point during the trial did counsel object to this or include it in a post-trial motion. Furthermore, as this Court has stated, in this situation, because of that fact, it's, you know – it could result to relying on plain error. However, that's not – plain error does not work in this case because of the fact that the evidence is not closely balanced. And furthermore, because of the fact that, as this Court previously decided that, you know, it wouldn't necessarily consider these actions to constitute reversible error. Well, if you misstate the burden of proof, isn't that a second-prong consideration? It is something, yes, that is considered under second-pronged plain error, yes, Your Honor. So moving on to the discussion of the 431A principles, the trial court did what it was required to do in 431A, and it conducted voir dire. The trial court introduced the attorneys, court staff, personnel, where a list of the witnesses in the trial inquired as to whether or not the jurors knew any of the personnel or the defendants or the witnesses that were going to be presented in the courtroom. They admonished the jury regarding the indictments. They read the indictments to the jury. They admonished the jury regarding the 431B principles. Now, the first sentence of 431A states that the court shall conduct voir dire examination of prospective jurors by putting to them question it thinks appropriate. Now, this allows discretion for the court to put forward questions that it thinks appropriate. Now, this 431A provides an extreme amount of discretion for the trial court in order to conduct voir dire. So looking to the second sentence, which the people in Garsticke stated was the relevant portion of the rule regarding that specific case, it says the court shall permit the parties to supplement the examination by such direct inquiry as the court deems proper. Now, the court permitted both the people and the defendant to go through and question the jurors. And before the trial court allowed them to do this, they put them on equal footing. It's said that, you know, very shortly the lawyers will be asking you some questions. You may feel that the lawyers are trying to embarrass you. You must not feel that the lawyers are trying to embarrass you, put you on the spot, or pry into your personal affairs. Now, the trial court did nothing to curtail the defense's examination of the voir dire. And the trial court only permitted the state to ask questions. And that's what the state did. They asked the questions that were on the juror cards and didn't really go any further beyond that. And furthermore, the actual statement of shall permit the parties to supplement examinations, the court found in People v. Dickey is something that's in favor of permitting the inquiry of jurors by the attorneys. And that's what this court did. That's what the trial court did. They permitted both sides to question the veneer. And then finally, neither side directly or indirectly questioned the jurors regarding matters of law. And then finally, to conclude, the trial court went through and said to the jurors, informed them regarding the final sentence of their duties as jurors, not to listen to all the evidence, to not come to an actual decision before they've gone through and heard all the evidence, that the attorneys' personalities are not supposed to affect their decisions. I mean, Dickey discussed objections and did several other things. And so he clearly complied with the entirety of 431A. Did the trial court limit either side in their questions as to the potential jurors? No, not so far, Your Honor. In the situation in Garsticke, the reason why it was upheld in that case is because of the fact that the trial court asked the attorneys what kind of questions they wanted to be asked. Defense counsel told the questions to the trial court, the questions that he wanted asked. The trial court asked those questions and then allowed the defense attorney, after all the entire veneer had been questioned, to go through and pick out jurors in which he wanted to question individually. And the defense counsel was permitted to do this in that case. Now, Your Honor, in that situation, Garsticke demonstrates that the court should err on the side of allowing attorneys to question the veneer. Now, it's up to the trial court's discretion. However, it's supposed to err on allowing these questions to be asked. Turning to the conclusion of the defense witness from testifying, Your Honor, looking to the facts surrounding the testimony of defendant's girlfriend, defense counsel was aware of her existence from day one of this entire ordeal. She was the individual who called the defense attorney on the day her boyfriend was arrested. So defense counsel was aware of her existence. And furthermore, defense counsel filed three separate answers to discovery on March 15th, December 20th, and April 24th, 2012. And then also, during a motion to suppress the show-up identification of the defendant, on July 20th, 2011, almost a year before the actual trial, defense counsel asked one of the officers whether or not the defendant had any tattoos on him and whether or not anybody said anything about tattoos. The officer said no. And then he specifically asked, did anyone say anything about tattoos on the defendant's hands? The officer said no. So we know that this defense counsel was aware of the fact that this was going to be something that was going to be at issue at trial, and yet he failed to include this person's name on the motion or on any of the answers to discovery. And he waited until the very last day of trial, 135, in the afternoon, when she was already present in court in order to notify the state's attorneys that she was going to be testifying. Now, in this situation, Your Honor, the people were prejudiced, and furthermore, the defendant can't demonstrate that he was prejudiced by the fact that this individual was prevented from testifying in this case. You know, he can't show that the evidence was closely balanced, and furthermore, he can't demonstrate that he was denied this ability to present a defense. When the defendant came down into the courtroom, showed his tattoos, this was an issue that wasn't really, you know, it was used for impeachment purposes, which, you know, was before the jury. However, in this situation, the jury just didn't buy it. You know, okay, he has tattoos on his hands, but when somebody's putting a gun at you, you know, you're not really going to be paying too close attention to the fact that he's putting, you know, what's on his hands when you're looking at the gun, and furthermore, he's walking around your home without a mask on. You got all this entire time, Mrs. Serrato said that he was in the house for over an hour and a half, Mr. Williams said he was in the house for over 45 minutes. They got a good look at this guy. They knew who it was. It's not something that's an issue of identity. So in this situation, the defendant was not, you know, the evidence wasn't closely balanced, and furthermore, he took this ability to, you know, show that the defendant had tattoos on his hands and link it up with the fact that she also testified that she hadn't seen him out on the street since the day he was arrested, and so defense counsel argued during closing argument, where did he get these tattoos? He had to have these tattoos before he went into jail. So, Your Honor, the defendant was completely able to present the defense in this. The trial court did not abuse its discretion in precluding this witness from testifying. Thank you. So, Your Honor, for these reasons and the reasons stated in our brief, we respectfully request this court to affirm defendant's convictions for home invasion, armed robbery, and personally discharging a firearm during the course of an armed robbery. Thank you. Thank you, counsel. Rebuttal. Thank you, Your Honor. I'd just like to make a couple points in rebuttal. There were a few questions, both to myself and to counsel, about how are we supposed to write an opinion here. Unless I misheard, and I may have, I think counsel just conceded this is revealable under, the first issue is revealable under a substantial rights problem. The court's opinion should go something like this. We're presented with a total breakdown in the jury selection process. Unprecedented. There's never been a case like it. Okay, let me stop you. If we don't believe that there's an A, then give us your B closing. I mean, your B writing. If we don't think that there's an error in the way that the judge allowed the lawyers to question the jurors and just deal with how he dealt with reasonable doubt. Just the reasonable doubt standard? Yes. Which I believe is the specific point in which counsel said that is revealable under substantial rights. We know that since Downs, the court can't define reasonable doubt to the jury. What the judge did here suggested a definition that's not correct under Downs. We acknowledge Johnson, but find it is. When you say since Downs, would you agree that Downs didn't necessarily announce that as a new rule? I mean, that's been the rule for a long, long time. Exactly. Don't define reasonable doubt. What Downs did was Downs kind of set the courts off to the path of saying that you can't say to the jury, it's for you to decide. And there was a couple of cases out there where the appellate courts said, well, you can't say that to the jury. And Downs really straightened that out. But Downs reaffirmed the concept that you can't define reasonable doubt. So that brings me back to the question of, well, that's always been the rule, and yet this conduct was affirmed in Johnson. Yes. As Justice Lampkin noted, we know that, right, Downs just clarified the law, didn't settle it. And we know in this room that you can't define reasonable doubt. That's verboten. Judge Gauden knew that, too. The record indicates he says Illinois does not define reasonable doubt and then decided to give a definition anyway. Johnson is a different case because in that case, the judge said that this is the highest definition of reasonable doubt. And also clarified that you've got to define it for yourself, which is something that we don't have in the case of Barr. Something we have in Downs where the court's response to the question in jury deliberations was give us a definition. And the court's response, which the Supreme Court approved of, was you've got to define that for yourself. Those facts, that remark from Judge Gauden was present in Johnson but is absent here. And that's significant. Any definition of reasonable doubt is totally verboten. You know, Garsteki, counsel mentioned Garsteki. My last point is that case was affirmed basically because it was the court that did voir dire, right? The court in Garsteki, the trial judge, did all voir dire. Counsel for the defense wanted to ask supplemental questions. And on review, right, he said, I should have allowed a supplement. That deals with the question of supplement. And that's dessert. The meat and potatoes is the voir dire that the court can't delegate. So while that case, Garsteki speaks the second sentence of 431A, its interpretation of that shall language that operates in 431A and B alike is instructive. That's a clear directive that the court couldn't delegate here. Because of this total breakdown in the jury selection process, reversal is required. Thank you. Before you leave, the state has made a pretty compelling case that the defense engaged in some sharp tactics with regard to the witness. Coy, coy. Coy, coy. That's part of the reason why I was ineffective, Your Honor. I mean, something like that. Amen. So our state made a pretty good case just now that this was some laying in the weeds, hiding in the bushes. And my question is, you know, in a situation like that, you know, on an issue like this, couldn't we say that that's an appropriate sanction? I mean, you know, there's all this circumstantial evidence that counsel was well aware that this was, this tattoo issue was in the case and he was relying on it. And yet he never, never even put her name on the, never even put coy, coy on the witness. Laying in wait. Never put coy, coy on the witness. A few things, Your Honor. So why isn't that an appropriate sanction? A few things. First, we argued in the alternative that counsel was ineffective, deficient for failing to disclose the witness. Then you've got to have prejudice. Second is that what Your Honor is concerned about is the fourth factor, bad faith. And it's important to remember something the state did not mention is that they did not object to this witness testifying at all. In fact, they offered to stipulate a part of her testimony. They didn't complain about not getting ready to cross her. They crossed her just fine about her relationship. This witness was listed in an arrest report. She came to the police station. That's not listed. You mean she's noted. She's noted. She's in the arrest report. But the state just said three answers to discovery were filed. And she wasn't put on a disemotional squash. And they talk about the tattoos. She's sitting in court. Every witness, four have been questioned. Once the defense lawyer was out of his mind, he knew he was going to call. I don't know if it was he. It could be a woman. I'm just doubting it was. It was Mrs. Burks. Wasn't she? I want to know who that is. I'll have to look. It seems pretty clear that the lawyer is laying in wait. That's what the judge basically said. A couple things. You know, defense filed a spoiler plate answer initially. He did file several answers. The first one includes a spoiler plate language about anyone listed in the arrest report and so on may be called as a witness for me. Counsel may have thought that that spoiler plate language complied with the rule. That suggests an honest mistake. Second, as part of the record we haven't discussed yet, is that the court allows this witness to testify to protect counsel's integrity. Throughout the proceedings, the court, Judge Gawin makes clear that he holds this attorney in high regard. This is the attorney that did the Juan Luna case. He seemed to make an honest mistake. The court allows him to put this witness on for a matter of integrity, which is one of the detectives said that it was counsel who brought her clothes. The witness was like, no, that was me that brought that. The court seems to find that the counsel is operating with. He let the witness be called to impeach somebody who said that somebody brought that person clothes. Yes, but the court framed that in terms of counsel's integrity, and he allowed her on because he felt that it was a matter touching upon counsel's integrity, which, again, the court seemed to hold in high regard. The state never complained about that. The court used when he didn't allow her. I can't remember exactly what he said. Yeah, I thought it was critical. I mean, the series of events is basically the state says, Judge, we just got a 135 notice of this witness. The court asks for a proffer, right? Counsel gives a proffer about two pieces of testimony. The state says, we'll stick to the clothes part of the testimony, but we object to her testifying about these tattoos. And the court's response, the last part of the exchange is, well, yeah, she's not going to testify to the tattoos because it's a matter touching upon counsel's integrity. And I'm paraphrasing here. I'm off probably about the language. We're going to allow her to testify as to these clothes. That's the exchange. I hope that answers your question, Your Honor. Any other questions? Thank you. Thank you. Okay. I want to thank counsel. It's a well-briefed, well-argued matter, and the court will take this under advisement. Court's adjourned. Thank you, counsel.